UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X

MICHAEL ISCENKO,

                           Plaintiff,

      -against-

THE CITY OF NEW YORK and NELDRA ZEIGLER,

                       Defendants.

-----------------------------------------------------------------------------X

         **COMPLAINT**

         No. 16-6535

         Jury Trial Demanded

Plaintiff, Michael Iscenko, by and through his attorneys, FAMIGHETTI & WEINICK, PLLC, alleges upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

### JURISDICTION AND VENUE

1.  This is a civil action based on Defendants' violations of Plaintiff's rights as guaranteed him by the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983 ("Section 1983") and any other cause of action which can be inferred from the facts set forth herein.  Further, Plaintiff asserts claims under the New York State Human Rights Law and the New York City Human Rights Law.[1]

2.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343. Supplemental jurisdiction is invoked over State and local causes of action pursuant to 28 U.S.C.

---

1  Plaintiff has filed a charge of discrimination with the EEOC and has requested that the EEOC issue a right to sue letter.  Upon receipt, Plaintiff intends to amend this complaint to allege claims under Title VII of the Civil Rights Act.

§ 1367.

3.  Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

4.  Plaintiff, Michael Isencko, is a resident of the State of New York, County of Nassau.

5.  The City of New York ("NYC") is a municipal corporation formed pursuant to the laws of the State of New York and having its principal place of business in New York County, New York.

6.  NYC operates the New York City Police Department ("NYPD") as its law enforcement agency.

7.  At all times relevant, Defendant, Neldra Zeigler ("DC Zeigler"), was an employee of the City of New York, performing services as the Deputy Commissioner of NYPD's Equal Employment Opportunity office, the highest ranking NYPD official in that office.  DC Zeigler is sued in her individual and official capacities.

**STATEMENT OF FACTS**

**Background Facts**

8.  Iscenko is a white male who served for four years in the U.S. military.

2

9.  In January 1986, the NYPD hired Iscenko as a police officer.

10. Iscenko performed his duties in an exemplary manner and after 11 years serving as police officer, the NYPD promoted Iscenko to the rank of sergeant.

**History of the Organized Crime Control Bureau and Changes in the Bureau**

11. In the early 2000's, the NYPD installed Doug Zeigler ("Chief Zeigler") as Chief of the Organized Crime Control Bureau ("OCCB").

12. Chief Zeigler is a black male.

13. In 2006, the NYPD replaced Chief Zeigler with Anthony Izzo ("Chief Izzo"), a white male, as chief of OCCB.

14. Chief Zeigler was transferred into a newly created position as chief of the Community Affairs Bureau.

15. Although the NYPD couched Chief Zeigler's transfer as a promotion for him, it was widely believed throughout the members of the NYPD that the transfer was made because the NYPD was unhappy with Chief Zeigler's performance as chief of the OCCB.

16. Indeed, Leonard Levitt, a columnist who writes about NYPD operations, wrote that Chief Zielger was "flopped" as head of OCCB and replaced with his "nemesis" Chief Izzo.

17. Levitt also wrote that Chief Zeigler's term as head of OCCB was a rare instance where a minority held a top decision making position in the NYPD and his transfer out represented a "larger problem for the department – the shortage of black officers in decision-making positions at its highest-levels."

18. In other words, the NYPD transferred out of OCCB a black chief and replaced him with a white chief.

19. Levitt further described Chief Zeigler's transfer as turning "the department's top black chief into a civilian."   In other words, Levitt confirmed the belief that the transfer was a demotion.

20. Upon Chief Izzo's assuming command of OCCB, he replaced Chief Zeigler's team with his own.

21. Indeed, Chief Izzo brought in a hand-picked team of sergeants and lieutenants, including with Iscenko, all of whom were white.

22. It was widely believed by members of the NYPD that these actions heightened the

4

animus between Chiefs Izzo and Zeigler.

**Chief Zeigler is a "Victim of Discrimination"**

23. In 2008, according to the New York Daily News, Chief Zeigler was parked in his car, off-duty, when two white plainclothes officers approached him.

24. Quoting Police Commissioner Raymond Kelly, the Daily News reported him saying that the officers "had no legitimate reason to approach" Chief Zeigler's car.

25. Again, according to one account reported by the Daily News, the officers ordered Chief Zeigler out of his car, not believing that he was an NYPD chief.

26. The incident resulted in at least one officer being placed on modified duty.

27. According to Levitt, Chief Zeigler alleged the incident resulted in him being the "victim of discrimination."

**Afters Years of Stellar Service, Iscenko is Falsley Accused and Targeted**

28. Throughout his time in OCCB, Iscenko continued to perform his duties in an exemplary manner.

29. In OCCB, Iscenko was assigned to work at 1 Police Plaza, the principal place of

business for the NYPD.

30. In 2008, the NYPD issued Iscenko a merit promotion and assigned him the rank of detective sergeant, further evidencing the NYPD's trust in Iscenko and belief that he performed his duties well.

31. On January 23, 2015, Iscenko was in the hallway near his office using his cellphone.

32. When he finished, he headed back to his office.

33. While walking back, he passed a civilian NYPD employee, Marilyn Montijo, who also had just used the bathroom, but who had stopped on her way back to her office to talk to another employee.

34. According to Montijo, who is a hispanic female and approximately 60 years old, she felt something "cold" on the back of her leg as Iscenko passed her.

35. She turned to look and saw "a creamy substance".

36. Monitjo asked Iscenko – who she knew only as "a Sgt. Mike" - "why did you do that?"

37. Not thinking he had done anything at all, Iscenko continued walking.

38. Montijo immediately made a complaint to the NYPD EEO alleging "national origin discrimination"; in other words, Montijo did not believe that anything sexual in nature had occurred.

39. As Deputy Commissioner, DC Zeigler is ultimately responsible for the NYPD EEO's office.

40. DC Zeigler, a black female, is married to Chief Zeigler.

41. On January 23, 2015, the same day as the "incident" and the same day Montijo complained, DC Zeigler issued to Iscenko a "Notice of Discrimination Complaint" indicating Montijo's complaint of "discrimination based on national origin" and that Sergeant Aiello would be interviewing Iscenko.

42. The Notice further advised Iscenko that, among other things,:

> The responsibility for investigating this complaint rests with the Office of the Deputy Commissioner Equal Employment Opportunity.  If it is determined that an act of unlawful employment discrimination occurred, a confidential  report will be submitted to the Police Commissioner at the conclusion of the investigation with a recommendation that appropriate corrective action be taken, which may include disciplinary action.

(Emphasis added).

43. While at EEO, the NYPD's evidence collection team ("ECT") met Monitjo.   ECT took and vouchered as evidence Montijo's stocking and the napkin she used to wipe the substance from her stocking.

44. Although she alleged there was a substance on her shoe as well, ECT took only a picture of the shoe and allowed Montijo to leave and go home with the shoe still on her.

45. Later that day, it was discovered that Montijo left with the shoe, so ECT went to her house to collect and voucher the shoe also.   In other words, the shoe was vouchered nearly six hours after the incident and after it had been contaminated by Montijo wearing and walking in it.

46. NYPD investigators immediately believed the substance was semen and, indeed, ECT vouchered the evidence as "biological evidence."

47. The proper procedure by which the NYPD should have handled biological evidence is that (1) the evidence is sent to the Crime Lab to receive a log number; (2) the evidence is immediately sent to the Medical Examiner's office for testing.   The biological testing must be performed before any other testing is done to avoid contamination, such as testing which would be done by the Crime Lab, and the evidence is not to be stored before testing.

48. Here, the NYPD deviated substantially from its procedures.

49. For example, the Crime Lab tested the substance for chemicals <u>before</u> sending the evidence to the Medical Examiner ("ME").

50. Further, the evidence was stored for five months in the Property Clerk's office before it was sent to the ME.

51. Three days after Montijo's complaint, DC Zeigler issued a second notice to Iscenko deleting the reference to national origin discrimination and instead vaguely stating that a "complaint of employment discrimination" was filed against him and that a detective would be interviewing Iscenko, instead of Sergeant Aiello.

52. On January 30, 2015, Iscenko testified at a Departmental Hearing ("GO15") and stated that he did not throw anything at Montijo, but may have inadvertently sneezed or coughed while walking by her.

53. Typically, a GO15 is conducted at the end of an investigation, thus, with respect to the G015, the NYPD again deviated from its procedures.

54. On May 18, 2015, nearly five months after the initial complaint, DC Zeigler advised Iscenko that the investigation was still continuing.

55. Approximately one week later, EEO asked Iscenko to provide a DNA sample, which

he refused to do.

56. Immediately, the NYPD placed Iscenko on "modified assignment", taking away his weapon, badge, ID card, and department cell phone.

57. Additionally, it transferred Iscenko to a housing bureau with significantly diminished and altered job responsibilities. At OCCB, Iscenko wore a suit and tie, interacted with high ranking officials such as Inspectors and Chiefs, supervised detectives, and received overtime. At the housing bureau, Iscenko wore jeans and sneakers and supervised and interacted with only low ranking police officers. Further, the assignment at housing offered no opportunities for overtime and, indeed, at housing, Iscenko did not receive overtime pay.

58. In June 2015, the NYPD suspended Iscenko without pay purportedly for making a false statement, to wit, the NYPD alleged his statement that he did not throw anything on Montijo was false.

59. In July 2015, the New York County District Attorney obtained a court order commanding the NYPD to collect from Iscenko a DNA sample.

60. Soon thereafter, Iscenko provided a DNA swab from his cheek to the NYPD, in cooperation with the criminal investigation.

61. Although the information about the Court order should have remained confidential,

upon information and belief, an informant from inside the NYPD leaked the contents of the order to the press, further inferring the Defendants' bad faith and improper motivations.   Such information and belief is based on the fact that the confidential information printed by the New York Post was information available only to people within the NYPD.

62. On July 6, 2015, DC Zeigler endorsed charges and specifications against Iscenko for the Montijo incident and the purported false statement.

63. On July 9, 2015, DC Zeigler advised Iscenko that the allegation of sexual harassment/hostile work environment was deemed "Unsubstantiated".

64. Although DC Zeigler is responsible for investigating EEO issues such as sexual harassment and hostile work environment, and although DC Zeigler initially advised Iscenko that she was investigating acts of unlawful employment discrimination and subsequently cleared him of such charges, she nonetheless "Substantiated" an unspecified allegation of "serious misconduct".

65. In mid-July 2015, Iscenko's suspension ended and he returned to work at the housing unit.

66. Soon after, the NYPD transferred Iscenko to the midnight shift, a less desirable shift and one which should have been given to a less senior sergeant, instead of to Iscenko who was

the most senior sergeant.

67. In early September 2015, Iscenko took vacation.

68. While on vacation, Iscenko's union lawyer told him the DNA test matched him and that he should consider retiring.

69. Accordingly, on September 1, 2015, Iscenko submitted paperwork to begin processing his retirement.

70. On September 3, 2015, the DA convened a Grand Jury which indicted Iscenko for a class B misdemeanor and for which a warrant issued.

71. This is an unusual procedure for a class B misdemeanor as typically arresting officers would simply issue a desk appearance ticket to a suspect charged with a class B misdemeanor. Iscenko was not aware of the grand jury, indictment, or warrant.

72. On September 9, 2015, Iscenko returned to work from vacation. At the end of his tour, he was driven to the Department Advocate's office where his department trial was scheduled.

73. Then, EEO police officers placed Iscenko under arrest and suspended him without

pay, again, for 30 days.

74. The NYPD took Iscenko to court for arraignment at which he pled not guilty and was released on bail.

75. In mid-September 2015, the Department trial began.

76. Montijo testified, among other things, that Iscenko was always courteous to her, he complimented her, he never laid his hands on her or made any advances on her and she could not understand why Iscenko would throw semen on her.

77. The ME testified that she did not test the substance with the goal of determining what the substance was. Rather, she believed it was semen and tested it to confirm it was semen.

78. Astonishingly, the ME could not confirm semen on the dress, stocking, or napkin. She found semen only on the shoe, which as discussed above, was contaminated.

79. Further, the ME's test was improper as set forth here:
The way that the ME determined the substance was semen was by use of the acid phosphatase and PSA exams. One test used was as a presumptive test and the other was as a confirmatory test. But, both of these tests are presumptive tests. One presumptive test cannot be used to confirm another presumptive test. Separate confirmatory tests must be used. If a presumptive test

is used and it comes out negative, there is no further testing, but if it comes out positive, then a confirmatory test must be used. Acid Phophatase is a presumptive test that looks for an enzyme that is present in semen but also found in other bodily fluids. Prostaste specific antigen ("PSA") is another presumptive test that looks for an antigen that is found in semen but also found in other bodily fluids. Here, the ME failed to conduct a proper confirmatory test by using either the "Christmas Tree Stain" which checks for the presence of sperm in the semen or the RSID semen strip test that checks for an antigen found only in the semen of human males. It is not found in any other bodily fluid and not found in women or in any different animal species. In other words, the NYPD did not use a test which confirms that the substance was, in fact, semen, and not some other bodily fluid.

80. Moreover, the ME's testimony about the DNA match revealed similar issues relating to the reliability of the DNA "evidence."  The ME testified that the substance from the shoe was put into a centrifuge which separated the substance into three layers based on weight.  Sperm is heaviest and settles to the bottom, seminal fluid settles in the middle, and epithelial cells (skin cells) float at the top.  The "sperm" fraction did not pass quality control and could not be tested (further, the NYPD did not even test whether sperm existed in the fraction).  In other words, the NYPD could not confirm that the sperm fraction matched Iscenko's DNA, to the extent sperm were even present, which the NYPD did not test.  Similarly, the seminal fluid fraction did not pass quality control.  The only DNA match was the skin cell layer.

81. The importance of the scientific tests cannot be understated.   The only thing the

NYPD could prove from the science is that Iscenko's skin cells wound up on Montijo.

82. The science did not prove that <u>any</u> semen was on her whatsoever and they certainly did not link any semen to Iscenko.

83. Indeed, it is highly likely that that the "sperm" and "seminal" layers did not meet quality control but that the epithelial layer did, because there was no semen so the sperm and seminal layers did not exist.

84. Iscenko testified that he did not throw anything at Monitjo.

85. In closing, the NYPD prosecutor stated, in sum and substance, "I don't know how you got that semen on her, but I know you did it."

86. Notwithstanding the total failure of the NYPD to show that Iscenko threw semen on Montijo and the facially absurd premise that Iscenko somehow managed to have his semen ready to throw on someone else and then did throw it on Montijo, the arbitrator determined that he was guilty and recommended he be terminated.

87. On September 28, 2015, the NYPD sent to Iscenko a letter (which he received on October 1, 2015) that he was terminated as of September 25, 2015.

88. The criminal proceedings, however, continued even after the termination.

89. Yet, a representative from DC Zeigler's office continued to appear at Iscenko's court dates, an unusual step in any routine court appearance for a NYPD representative to appear, but even more unusual here where Iscenko had already been terminated and the representative was from an office which handles internal police employment matters.

90. As a police officer for 29 years, Iscenko routinely saw the DA's office agree to plea deals including discontinuances for suspects charged with violent felonies.

91. The DA, however, refused and continues to refuse to agree to any plea deal with Iscenko involving a discontinuance, even though he is charged only with a low level misdemeanor.

92. The DA continued to maintain its position even after it told Iscenko that it lost the DNA evidence, the only way to prove the case.

93. In May 2016, the DA "found" the DNA evidence and turned it over to Iscenko.

94. Iscenko immediately had the evidence tested which revealed based on a microscopic, presumptive and confirmatory test that the substance on the shoe was saliva and not semen.

16

95. In other words, the evidence exonerated Iscenko and confirmed that his statements about coughing or sneezing were truthful.

96. Notwithstanding this evidence, the DA continues to prosecute the criminal case against Iscenko, a case which is impossible to prove based on Iscenko's scientific evidence.[2]

## FIRST CLAIM
(Fourteenth Amendment – Equal Protection – Race Discrimination)

97. Defendant, Neldra Zeigler, took adverse employment actions against Iscenko, including suspension without pay, transfer with significantly diminished responsibilities, charges, and termination, based, in part, on Iscenko's race, which can be inferred from (1) DC Zeigler's relationship to Chief Zeigler and Chief's Zeigler's history with the NYPD and, specifically, with the OCCB unit, of which Iscenko was a part, (2) DC Zeigler and the NYPD's deviating from procedure with respect to the investigation of Iscenko; (3) DC Zeigler's and the NYPD continuing to prosecute Iscenko long after it became clear that Iscenko was not guilty of the misconduct of which he was accused.

98. Defendant, the City of New York, is liable under <u>Monell v. Dep't of Social Servs.</u>, because its deliberate indifference led to the Constitutional deprivation.   Such deliberate indifference can be inferred from the following facts: (1) the City of New York knew that it would be confronted with issues of unconstitutional and unlawful discrimination as shown by its establishment of the NYPD EEO whose mission is to investigate, prevent, and correct instances

---

2  As soon as the criminal action is resolved in Iscenko's favor, he intends to amend this
   Complaint to assert a claim for malicious prosecution.

of unlawful discrimination; but (2) the EEO office wholly failed in its mission as to Iscenko by failing to conduct a proper investigation and to adhere to established NYPD and criminal investigative techniques which suggests that the individuals who handled Iscenko's investigation were not adequately trained by the City in such techniques and procedures. Additionally, DC Zeigler is the highest ranking NYPD official in the NYPD EEO and is thus a policymaker.

## SECOND CLAIM
### (New York State Human Rights Law – Race Discrimination)

99. Defendant, the City of New York, took adverse employment actions against Iscenko, including suspension without pay, transfer with significantly diminished responsibilities, charges, and termination, based, in part, on Iscenko's race, which can be inferred from (1) DC Zeigler's relationship to Chief Zeigler and Chief's Zeigler's history with the NYPD and, specifically, with the OCCB unit, of which Iscenko was a part, (2) DC Zeigler and the NYPD's deviating from procedure with respect to the investigation of Iscenko; (3) DC Zeigler's and the NYPD continuing to prosecute Iscenko long after it became clear that Iscenko was not guilty of the misconduct of which he was accused.

100. Defendant, Neldra Zeigler, is liable under the New York State Human Rights Law as an aider an abettor and/or as an employer.

## THIRD CLAIM
### (New York City Human Rights Law – Race Discrimination)

101. Defendant, the City of New York, took adverse employment actions against

Iscenko, including suspension without pay, transfer with significantly diminished responsibilities, charges, and termination, based, in part, on Iscenko's race, which can be inferred from (1) DC Zeigler's relationship to Chief Zeigler and Chief's Zeigler's history with the NYPD and, specifically, with the OCCB unit, of which Iscenko was a part, (2) DC Zeigler and the NYPD's deviating from procedure with respect to the investigation of Iscenko; (3) DC Zeigler's and the NYPD continuing to prosecute Iscenko long after it because clear that Iscenko was not guilty of the misconduct of which he was accused.

102.    Defendant, Neldra Zeigler, is liable under the New York City Human Rights Law as an aider an abettor and/or as an employer.

**WHEREFORE,** Plaintiff demands judgment against Defendants, were applicable, for all compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, overtime pay, loss of benefits, reinstatement, injunctive relief, liquidated damages (where applicable), statutory damages, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled.  Plaintiff demands a trial by jury.

Dated: Melville, New York
       August 18, 2016

Famighetti & Weinick, PLLC
*Attorneys for Plaintiff*
155 Pinelawn Road, Suite 220S
Melville, New York 11747
(631) 352-0050

_____/s/_____
Matthew Weinick

19