UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
MICHAEL ISCENKO,

                        Plaintiff,

      -against-

                                             No. 16 Civ. 6535 (LGS)

THE CITY OF NEW YORK and NELDRA ZEIGLER,

                        Defendants.

---------------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

FAMIGHETTI & WEINICK, PLLC
*Attorneys for the Plaintiff*
155 Pinelawn Road, Suite 220S
Melville, N.Y.  11747
(631) 352-0050

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 1

STANDARD OF REVIEW ..................................................................................................... 7

ARGUMENT ........................................................................................................................ 9

   I.   HISTORY, PROCEDURAL DEVIATIONS, AND IMPLAUSIBILITIES SHOW
DISCRIMINATION .......................................................................................................... 9

      A.  The Historical Background of Discrimination Against Chief Zeigler ..........................11
      B.  The Implausibility of Defendants' Allegations ...............................................11
      C.  Deviations from Procedure.......................................................................... 12
      D.  Actions Taken for No Logical Explanation.................................................... 15
      E.  Open Hostilities........................................................................................ 16
      F.  Montijo's Complaint Provided Zeigler With an Opportunity to Discriminate .............. 17

   II.   COLLATERAL ESTOPPEL HAS NO IMPACT ON THIS ACTION ............................. 18

      A.  Defendants Have Not Shown the Elements of Collateral Estoppel .............................. 18
      B.  Iscenko Does Not Need to Prove His Innocence ........................................ 20
      C.  Iscenko's Scientific Evidence is Probative as to Defendants' Intent ............................ 21

   III.   ZEIGLER'S PERSONAL INVOLVEMENT IN DISCRIMINATION IS ALLEGED .. 21

      A.  DC Zeigler Issued Charges and Directed Other Conduct at Iscenko ........................... 22
      B.  Race Discrimination Law is Clearly Established......................................... 22

   IV.   ZEIGLER IS A POLICYMAKER WHO FAILED TO ADEQUATELY TRAIN  AND
SUPERVISE HER SUBORDINATES ................................................................................ 23

      A.  The Procedural Deviations Show the NYPD Failed to Train and Supervise ................ 23
      B.  DC Zeigler is a Policy Maker....................................................................... 24

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

Amorosano-Lepore v. Generoso,
   06-CV-1223, 2008 U.S. Dist. LEXIS 55641 (S.D.N.Y. July 18, 2008).................................... 22

Ashcroft v. Iqbal,
   556 U.S. 662 (2009).......................................................................................... 7

Bear, Stearns, & Co. v. 1109580 Ont. Inc.,
   409 F.3d 87 (2d Cir. 2005) ................................................................................. 19

Blonder-Tongue Lab. v. Univ. of Ill. Found.,
   402 U.S. 313 (1971).......................................................................................... 19

Board of County Commissioners of Bryan County v. Brown,
   520 U.S. 397 (1997).......................................................................................... 23

Buttaro v. City of New York,
   15-CV-5703, 2016 U.S. Dist. LEXIS 125965 (E.D.N.Y Sept. 15, 2016)................................ 20

CBF Industria de Gusa S/A v. AMCI Holdings, Inc.,
   15-1133-cv, 2017 U.S. App. LEXIS 899  (2d Cir. Jan. 18, 2017) ......................................... 19

Chambers v. Time Warner, Inc.
   282 F.3d 147  (2d Cir. 2002) ............................................................................... 8

Cine SK8, Inc. v. Town of Henrietta,
   507 F.3d 778 (2d Cir. 2007) ............................................................................... 24

Connick v. Thompson,
   563 U.S. 51 (2011)............................................................................................ 24

DeCintio v. Westchester County Med. Ctr.,
   821 F.2d 111  (2d Cir. 1987) ............................................................................... 20

Dooley v. JetBlue Airways Corp.,
   636 Fed. Appx. 16 (2d Cir. 2015) ......................................................................... 12

Espinal v. Goord,
   558 F.3d 119 (2d Cir. 2009) ............................................................................... 17

Feingold v. New York,
   366 F.3d 138 (2d Cir. 2004) ............................................................................... 22

Fierro v. City of N.Y.,
   341 Fed. Appx. 696 (2d Cir. July 27, 2009)............................................................... 22

Foss v. Coca-Cola Enters.,
   2011 U.S. Dist. LEXIS 34945 (E.D.N.Y. 2011) ........................................................ 13

Francis v. Coughlin,
   891 F.2d 43 (2d Cir. 1989) ................................................................................. 23

Galin v. United States,
   No. 08-CV-2508, 2008 U.S. Dist. LEXIS 103884 (S.D.N.Y. 2008)..................................... 19

Global Network Communications, Inc. v. City of New York,
   458 F.3d 150 (2d Cir. 2006) ................................................................................ 8

Grieve v. Tamerin,
   269 F.3d 149 (2d Cir. 2001) ............................................................................... 18

Jefferson v. Koenig,
   15-CV-0544, 2016 U.S. Dist. LEXIS 5464  (E.D.N.Y. Jan. 15, 2016) .................................... 23

Jermosen v. Smith,

945 F.2d 547 (2d Cir. 1991) ................................................................................. 23

Johnson v. City of New York,
06 CV 09426, 2011 U.S. Dist. LEXIS 15867 (S.D.N.Y. Feb. 15, 2011) .................................. 24

King v. City of New York,
12-CV-2344, 2014 U.S. Dist. LEXIS 140790 (E.D.N.Y. Sept. 30, 2014) ............................. 8, 9

Kinzer v. Jackson,
316 F.3d 139 (2d Cir. 2003) ................................................................................. 21

Kwan v. Andalex Group LLC,
737 F.3d 834 (2d Cir. 2013) ................................................................................. 10

LeBlanc-Sternberg v. Fletcher,
67 F.3d 412 (2d Cir. 1995) ................................................................................. 10

Lehal v. Central Falls Detention Facility Corp.,
13cv3923, 2016 U.S. Dist. LEXIS 177587 (S.D.N.Y. Nov. 21, 2016) .................................. 23

Levich v. Liberty Central Sch. Dist.,
361 F. Supp. 2d 151 (S.D.N.Y. 2004) ..................................................................... 19

Littlejohn v. City of New York,
795 F.3d 297 (2d Cir. 2015) ................................................................................. 8

Loeffler v. Staten Island Univ. Hosp.,
582 F.3d 268 (2d Cir. 2009) ................................................................................. 10

Mandell v. County of Suffolk,
316 F.3d 368 (2d Cir. 1999) ................................................................................. 23

Matusick v. Erie County Water Auth.,
757 F.3d 31 (2d Cir. 2014) .................................................................................. 11

McPherson v. N.Y.C. Dep't of Educ.,
457 F.3d 211 (2d Cir. 2006) ................................................................................. 20

Nagle v. Marron,
663 F.3d 100 (2d Cir. 2011) ................................................................................. 24

Nakahata v. New York-Presbyterian Healthcare Sys.,
723 F.3d 192 (2d Cir. 2013) ................................................................................. 8

People v. Plevy,
52 N.Y.2d 58 (1980).......................................................................................... 21

Ragin v. Newburgh Enlarged City Sch. Dist.,
06 Civ. 2797, 2009 U.S. Dist. LEXIS 118704  (S.D.N.Y. Dec. 17, 2009)................................ 23

Robinson v. Gucci Amer.,
No. 11-CV-3742, 2012 U.S. Dist. LEXIS 10014 (S.D.N.Y. Jan. 26, 2012) ...................... 15, 22

Rothstein v. UBS AG,
708 F.3d 82 (2d Cir. 2013) ................................................................................... 7

Skehan v. Village of Mamaroneck,
465 F.3d 96 (2d Cir. 2006) ................................................................................. 20

Sotomayor v. City of New York,
862 F. Supp. 2d 226 (E.D.N.Y. 2012) ..................................................................... 10

Stratton v. Dep't of the Aging,
132 F.3d 869 (2d Cir. 1997) ........................................................................... 10, 15

Summa v. Hofstra Univ.,
708 F.3d 115 (2d Cir. 2013) ................................................................................. 17

Tsombanidis v. West Haven Fire Dept.,

352 F.3d 565 (2d Cir. 2003) ................................................................................. 10

Vega v. Hempstead Union Free School District,
    801 F.3d 72 (2d Cir. 2015) ............................................................................. 7, 10

Villar v. City of New York,
    135 F. Supp. 3d 105 (S.D.N.Y. 2015) ............................................................ 12, 13

Walsh v. N.Y.C. Housing Auth.,
    828 F.3d 70 (2d Cir. 2016) ................................................................................. 10

Zahorik v. Cornell Univ.,
    729 F.2d 85 (2d Cir. 1984) ................................................................................. 10

**Statutes**
42 U.S.C. 2000ff-1(b) .......................................................................................... 13

## PRELIMINARY STATEMENT

This lawsuit arises from Defendants, the City of New York (the "City") and Neldra Zeigler ("DC Zeigler"), discriminating against Plaintiff, Michael Iscenko, on the basis of his race.  On August 18, 2016, Iscenko commenced this action based on Defendants' violations of the Fourteenth Amendment (as enforced by 42 U.S.C. 1983 ("Section 1983")) and the New York State and New York City Human Rights Laws ("NYSHRL" and "NYCHRL", respectively). Iscenko also asserts a claim under Title VII against the City.[1]

Defendants have moved to dismiss all claims pursuant to FED. R. CIV. P. 12(b)(6). Defendants motion should be denied because the Amended Complaint sets forth facts plausibly showing an inference of discrimination.  Those facts include that DC Zeigler's husband, Chief Zeigler, was formerly the head of Iscenko's unit, until he was ousted under circumstances believed to be racially motivated.  Soon after, Chief Zeigler was again the subject of discrimination by white officers while he was off-duty.  When a civilian employee accused Iscenko of discriminating against her and made the complaint to DC Zeigler's Equal Employment Office ("EEO"), it provided DC Zeigler the opportunity to avenge her husband's discrimination and to discriminate against a white officer from Chief Zeigler's former unit.  This evidence is discussed below.

## STATEMENT OF FACTS

Iscenko is a white male, hired by the NYPD in 1986.  (AC ¶¶ 8-9).  After eleven years, the NYPD promoted Iscenko to sergeant, showing their faith in his performance.  (AC ¶ 10).

In the early 2000s, the NYPD installed Doug Zeigler ("Chief Ziegler"), a black male, as Chief of the NYPD's Organized Crime Control Bureau ("OCCB").  (AC ¶¶ 11-12).  In 2006, the

---

1  On December 20, 2016, Iscenko filed an Amended Complaint ("AC") with consent of Defendants, to assert the Title VII claim.

NYPD transferred Chief Zeigler out of OCCB, placed him in a newly created position as Chief of the Community Affairs Bureau, and installed a white male, Anthony Izzo, into the OCCB chief position.  (AC ¶¶ 13-14).  NYPD officers believed the department replaced Chief Zeigler because they were unhappy with his performance and the transfer acted as a demotion, even though the NYPD called his new position a promotion.  (AC ¶ 15, 19).  The press described the move as Chief Zeigler being "flopped" and being demoted to a civilian, then being replaced with his nemesis, Izzo.  (AC ¶¶ 16, 19).   The press further lamented that the move to replace a minority in a top decision making decision in the department represented "a larger problem for the department – the shortage of black officers in decision-making positions at its highest-levels."  (AC ¶ 17).   In other words, this move involved significant racial issues and racial tensions lurking beneath the surface.

Upon taking command of OCCB, Izzo replaced all of Chief Zeigler's team with his own hand-picked sergeants and lieutenants, including Iscenko.  (AC ¶¶ 20-21).  All of Izzo's replacements were white and NYPD members believed this heightened the animus between Izzo and Chief Zeigler.  (AC ¶ 21-22).  At OCCB, Iscnko worked at 1 Police Plaza, NYPD's headquarters.  (AC ¶ 29).  In 2008, the NYPD issued Iscenko a merit promotion to detective sergeant, showing the NYPD's belief that Iscenko performed his job well.  (AC ¶ 30).

Also in 2008, "with no legitimate reason," two white plainclothes NYPD officers approached Chief Zeigler while he was parked in his car, off-duty.  (AC ¶¶ 23-24).  Refusing to believe Chief Zeigler was an NYPD chief, the officers ordered Chief Zeigler out of his car.  (AC ¶ 24).  Chief Zeigler thought the incident caused him to be a "victim of discrimination" and at least one of the officers involved was placed on modified duty as a result of the incident.  (AC ¶ 26-27).  Thus, within two years, Chief Zeigler was subjected to two actions by the NYPD which

were at least perceived to be racially motivated.

On January 23, 2015, Iscenko was using his cellphone in the hallway near his office. (AC ¶ 31).  He headed back to his office and passed a civilian employee, Marilyn Montijo.  (AC ¶¶ 32-33).  As Iscenko passed, Montijo felt something cold on the back of her leg and turned to see a creamy substance on her leg.  (AC ¶¶ 34-35).  She asked Iscenko "why did you do that," but thinking he had not done anything wrong, Iscenko continued walking.  (AC ¶¶ 36-37). Montijo complained to the NYPD EEO that she had been discriminated against based on national origin discrimination.  (AC ¶¶ 38, 41).  While there, the NYPD's evidence collection team ("ECT") took and vouchered Montijo's stocking and the napkin she used to wipe the substance off.  (AC ¶ 43).  Montijo had substance on her shoe, also, but ECT only took a picture of it and let Montijo wear the shoe home.  (AC ¶ 44).  Before any testing and in the absence of a belief by Montijo that the "incident" was sex or gender based, the NYPD made a determination that the substance was semen and the evidence was vouchered as "biological evidence."  (AC ¶ 46).

DC Zeigler, a black female married to Chief Zeigler, is Deputy Commissioner of EEO and is ultimately responsible for the office.  (AC ¶¶ 39-40).  On January 23, 2015, DC Zeigler issued to Iscenko a "Notice of Discrimination Complaint" noting it was "based on national origin" and that a Sergeant Aiello would interview Iscenko.  (AC ¶ 41).  The notice further stated that DC Zeigler's office was responsible for investigating, and it would issue a report to the Police Commissioner if an "act of unlawful employment discrimination occurred."  (AC ¶ 42).

After nearly six hours of Montijo wearing her shoe, including wearing it home, ECT went to her house and collected and vouchered the shoe.  (AC ¶ 45).

In collecting all the "evidence" in Iscenko's case, the NYPD deviated substantially from its procedure.   For example, biological evidence should be sent to the Medical Examiner for

testing before testing by the Crime Lab, but here, the Crime Lab tested the evidence first.  (AC ¶ 49).  Further, Iscenko's evidence was stored in the Property Clerk's office for five months before it was ever tested by the Medical Examiner.  (AC ¶ 50).

Three days after the initial complaint, DC Zeigler issued to Iscenko a second notice, removing the reference to national origin and instead vaguely asserting "a complaint of employment discrimination."  (AC ¶ 51).  Additionally, the notice stated a detective would interview Iscenko, not Sergeant Aiello.  (AC ¶ 51).

On January 30, 2015, the department again deviated from procedure by holding a GO15 Departmental Hearing.  (AC ¶ 53).  GO15 hearings are conducted at the end of investigations, not at the start.  (AC ¶ 53).  At the hearing, Iscenko testified that may have inadvertently sneezed or coughed, but that he did not intentionally throw anything on Montijo.  (AC ¶ 52).

After five months of investigation, DC Zeigler told Iscenko on May 18, 2015, that the investigation was continuing.  (AC ¶ 54).  About a week later, EEO asked Iscenko to provide a DNA sample which he refused to do.  (AC ¶ 55). Immediately, Iscenko was placed on "modified assignment" in which his weapon, badge, ID card, and department cell phone were taken from him.  (AC ¶ 56).  Further, Iscenko was transferred to a housing bureau and his job responsibilities were altered and diminished.  (AC ¶ 57).

In June 2015, the NYPD suspended Iscenko without pay for purportedly making a false statement that he did not throw anything on Montijo.  (AC ¶ 58).  Then, in July 2015, the New York County DA obtained a court order compelling the NYPD to collect Iscenko's DNA, which he then voluntarily provided.  (AC ¶¶ 59-60).  The Court order should have been confidential, but it was leaked by the NYPD as evidenced by an article printed by the New York Post which contained information available only to the NYPD.  (AC ¶ 61).

4

On July 6, 2015, DC Zeigler issued charges and specifications against Iscenko, but yet just three days later, she told Iscenko that the allegations of sexual harassment/hostile work environment, i.e. discrimination, were deemed "Unsubstantiated".  (AC ¶ 62, 63).  She also, however, substantiated an unspecified charge of "serious misconduct."  (AC ¶ 64).  Since DC Zeigler is responsible for discrimination matters and she cleared Iscenko of those charges, her issuance of other charges against Iscenko is unusual.  (See AC ¶ 39, 63-65).

In mid-July, Iscenko's suspension ended and he returned to work at the housing unit.  (AC ¶ 65).  Soon after, the NYPD transferred Iscenko to the midnight shift, a less desirable shift which is usually given to sergeants with less seniority than Iscenko.  (AC ¶ 66).

In early September 2015, Iscenko was on vacation when his lawyer told him his DNA test matched so he should consider retiring.  (AC ¶ 667-68).  Accordingly, Iscenko submitted the paperwork to begin the retirement process.  (AC ¶ 69).

On September 3, 2015, the DA convened a Grand Jury, an unusual procedure for a class B misdemeanor as arresting officers would typically issue a desk appearance ticket.  (AC ¶ 70-71).  The Grand Jury indicted Iscenko and a warrant was issued.  (AC ¶ 70).

On September 9, 2015, Iscenko returned to work from vacation and at the end of his shift, he was taken to the department advocates office to schedule a departmental trial.  (AC ¶ 72).  Immediately after, EEO police officers placed Iscenko under arrest and he was suspended without pay for 30 days.  (AC ¶ 73).  The officers took Iscenko to court for arraignment, at which time he pled not guilty and was released on bail.  (AC ¶ 73-74).

In mid-September, the Department trial began.  (AC ¶ 75).  Montijo expressed that she could not understand why Iscenko would throw semen on her.  (AC ¶ 76).  The Medical Examiner testified that she examined the substance looking for semen.  (AC ¶ 77).  She could not

confirm semen on the stocking or napkin, but testified that she found semen on the shoe.  (AC ¶ 77-78).  The examiner testified about the process she used to test the substance, which showed the process was improper.  (AC ¶ 79).  For instance, the two tests she used were both "presumptive tests," which is improper because one presumptive test cannot be used to confirm another presumptive test.  (AC ¶ 79).  Essentially, the NYPD did not use a test which confirms the substance was semen and was not some other bodily fluid.  (AC ¶ 79).

Additionally, when she examined the substance, she put it through a centrifuge which separated it into three layers based on weight: (1) the sperm layer which is heaviest settles to the bottom; (2) the seminal fluid layer settles in the middle; and (3) the epithelial or skin cell layer floats to the top.  (AC ¶ 80).  Notably, the NYPD did not determine whether sperm were present in the sperm layer, but regardless, neither the sperm nor seminal layers passed quality control, probably because there was no semen so those layers did not exist.  (AC ¶ 80, 83).  So, the only DNA match was from the skin cell layer, which shows that the only thing the NYPD could prove was that Iscenko's skin cells wound up on Montijo.  (AC ¶ 80-81).  In other words, the NYPD could not possibly have proven that Iscenko's semen was on Montijo.  (AC ¶ 81-82).

Then, Iscenko testified that he did not throw anything on Montijo.  (AC ¶ 84).  The NYPD prosecutor closed, saying in sum and substance, that she did not know how Iscenko got semen on Montijo, but she knows he did, clearly acknowledging the premeditation and careful planning such a feat would require and further implicitly acknowledging that she had absolutely no proof – or even a theory – of how Iscenko could have perpetrated the act.  (AC ¶ 85).

The arbitrator determined Iscenko was guilty, notwithstanding the overwhelming failure of the NYPD to prove the substance was semen.  (AC ¶ 86).  On October 1, 2015, Iscenko received notice that the NYPD terminated him as of September 25, 2015.  (AC ¶ 87).

The criminal proceedings continued (and still continues), despite the fact that the DA routinely agrees to plea deals or discontinuances for much more serious offenses.  (AC ¶ 88, 90).  The DA refuses to agree to any plea deal involving a discontinuance for Iscenko.  (AC ¶ 91).  Further, DC Zeigler sends a representative from her office to Iscenko's court appearances, an unusual step in any routine court proceeding, but more bizarre here since Iscenko has been terminated and DC Zeigler's office handles internal NYPD employment matters.  (AC ¶ 89).

During the course of the criminal case, the DA asserted that the DNA evidence was lost, thus it became impossible to prove the case, but the DA still refused to drop the case.  (AC ¶ 92).  In May 2016, the DA "found" the evidence, which Iscenko immediately had tested.  (AC ¶ 93).  Iscenko's lab tested the material via microscope and presumptive and confirmatory tests, which revealed the substance was saliva, not semen.  (AC ¶ 95).  With clear exonerating scientific evidence, the DA continues to prosecute the case.  (AC ¶ 96).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation omitted). "Facial plausibility" is achieved when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.  In considering a Rule 12(b)(6) motion, courts must accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. See Rothstein v. UBS AG, 708 F.3d 82, 90 (2d Cir. 2013).

In clarifying the pleading standard for employment discrimination cases, the Second Circuit has emphasized that plaintiffs need not set forth each element of a *prima facie* case of discrimination.  Vega v. Hempstead Union Free School District, 801 F.3d 72, 84 (2d Cir. 2015);

Littlejohn v. City of New York, 795 F.3d 297 (2d Cir. 2015).  Rather, the Iqbal framework applies

so plaintiffs must "plausibly allege that (1) the employer took adverse action against him, and (2)

his race, color, religion, sex, or national origin was a motivating factor in the employment

decision."  Vega, 80 F.3d at 87.

In considering a Rule 12(b)(6) motion, courts "do not consider matters outside the

pleadings."  Nakahata v. New York-Presbyterian Healthcare Sys., 723 F.3d 192, 202 (2d Cir.

2013) (citation omitted).  Courts may consider documents submitted by a defendant on a motion

to dismiss if the plaintiff relied "on the terms and effects of the document in drafting the

complaint."  Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 156 (2d

Cir. 2006) (quotation omitted).  The plaintiff must have "heavily" relied on the document.  Id.

(citing Chambers v. Time Warner, Inc. 282 F.3d 147, 154 (2d Cir. 2002)).  The Second Circuit

has observed that it is usually appropriate to apply the "heavily relied on" exception when:

> the incorporated material is a contract or other legal document
> containing obligations upon which the plaintiff's complaint stands
> or falls, but which for some reason -- usually because the
> document, read in its entirety, would undermine the legitimacy of
> the plaintiff's claim -- was not attached to the complaint.

Id. (citation omitted).

In King v. City of New York, the plaintiff relied heavily on extrinsic documents in

framing his complaint and thus the Court exercised its discretion to consider those documents.

12-CV-2344, 2014 U.S. Dist. LEXIS 140790, * 22-24 (E.D.N.Y. Sept. 30, 2014).  For example,

the Court considered a letter quoted extensively in the complaint and it considered documents

containing statements made in the plaintiff's underlying criminal matter which were described in

the complaint, and he stated the specific charges from his criminal indictment.  Id.

Here, Defendants have submitted a document purporting to be a "Final Order of

Dismissal, of Disposition of Charges, and Decision of NYPD Deputy Commissioner for Trials Rosemarie Maldonado" (the "Extrinsic Material").[2]  (Nacchio Decl. ¶ 2).  As compared to <u>King</u>, Iscenko's complaint does not extensively quote the Extrinsic Material or even quote it or paraphrase it, at all. The Amended Complaint does not reference the Final Order, instead noting that Iscenko was notified of his termination by letter received on October 1, 2015.  (AC ¶ 87).

Further, the Extrinsic Materials were not heavily relied on in framing the Amended Complaint.  Plaintiff's discrimination complaint does not "stand or fall" on these documents, but rather on the discriminatory motivations of Defendants.  As discussed in the collateral estoppel section, the issue in the case is Defendants' motivations for prosecuting Iscenko and the Extrinsic Materials have no relevance on that issue, so that cannot be considered as having been heavily relied on in drafting the complaint.

As discussed below, the motion to dismiss should be denied because, whether the Extrinsic Material is considered or not, the allegations in the Amended Complaint, which are not refuted by the Extrinsic Material, plausibly establish that Defendants took an opportunity to discriminate against Iscenko based on him being a white police officer of the OCCB unit.

## ARGUMENT

## I.   HISTORY, PROCEDURAL DEVIATIONS, AND IMPLAUSIBILITIES SHOW DISCRIMINATION

"[A]t the initial stage of a litigation, the plaintiff's burden is minimal -- he need only

---

2  It is not clear whether Defendants assert these documents are to be considered one document or whether they are three or more separate documents, i.e. the Final Order, the charges, and the Decision.  Whether considered collectively or individually, the documents are not heavily relied on in framing the Amended Complaint, as discussed below.  Additionally, Defendants memo of law makes the wholly improper statement that a video shows Iscenko throwing a substance on Montijo.  (Def. Memo at 1).  The video is not referenced at all in the complaint so it should not be considered nor should Counsel's prejudicial statement about what the video purportedly shows be considered.  Indeed, even the hearing officer could not conclude that the video shows Iscenko throwing anything. (Nacchio Ex. A at 4, 9).

plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" Vega, 801 F.3d at 86-87 (quoting Littlejohn, 795 F.3d at 297).  The employer need only be motivated, "in part," by a discriminatory motivation.  Id.[3]  "Minimal support" for such motivation may be shown "by creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination." Id. (citations omitted).  The evidence must be considered as a whole, and not individually.  Walsh v. N.Y.C. Housing Auth., 828 F.3d 70, 76 (2d Cir. 2016) (noting "no one piece of evidence need be sufficient, standing alone" and that "a plaintiff may satisfy her burden by building a wall out of individual evidentiary bricks").

The bits and pieces of evidence from which a retaliatory motive can be inferred include: historical background of the decision, deviations from procedures, taking actions for no logical reasons, and weaknesses and implausibilities in an employer's business reason.  Kwan v. Andalex Group LLC, 737 F.3d 834, 846 (2d Cir. 2013);  Zahorik v. Cornell Univ., 729 F.2d 85, 93 (2d Cir. 1984); Tsombanidis v. West Haven Fire Dept., 352 F.3d 565, 580 (2d Cir. 2003);  Stratton v. Dep't of the Aging, 132 F.3d 869, 880 n.6 (2d Cir. 1997);  LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir. 1995).

Here, Defendants argue that the Amended Complaint fails to establish that they were motivated by discriminatory intent.  As discussed below, the Amended Complaint sets forth evidence plausibly establishing intent, including: (A) historical background; (B) implausibilities; (C) deviation from procedures; (D) taking actions for no logical reason;  (E) open hostilities and (F) the availability of an opportunity to discriminate against Iscenko.

---

3  The claims pursuant to Title VII, Section 1983, and the NYSHRL are analyzed the same. Sotomayor v. City of New York, 862 F. Supp. 2d 226, 252 (E.D.N.Y. 2012).  NYCHRL claims must be given "an independent liberal construction."  Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009).

**A.      The Historical Background of Discrimination Against Chief Zeigler**

Here, the Amended Complaint sets forth an important history about the Zeiglers which provides the entire backdrop for this case.  Chief Zeigler was the head of OCCB until he was ousted by a white chief and essentially demoted to a civilian position.  Chief Zeigler's replacement, Izzo, brought in an all-white team which included Iscenko, causing Chief Zeigler to be upset with Izzo.  (AC ¶ 21-22).  That Chief Zeigler was upset because Izzo brought in an all "white" team, plausibly infers that Chief Zeigler's animus was motivated, at least in part, by race.

Soon after this ouster, Chief Zeigler was subjected to further embarrassment at the hands of white police officers who refused to believe he was an NYPD chief and ordered him out of his car while he was off-duty, action Chief Zeigler thought caused him to be a "victim of discrimination."  A jury could reasonably and plausibly infer that Chief Zeigler's wife, DC Zeigler, developed a simmering animus towards white officers, particularly towards those white officers placed into the OCCB by Izzo, because of prior racial discrimination directed at her husband.  See Matusick v. Erie County Water Auth., 757 F.3d 31, 60 (2d Cir. 2014) (discussing racial association claims).

Plaintiff acknowledges that this evidence, alone, likely could not suffice to establish causation in this case.  This history, however, provides context and a backdrop for the all the other evidence discussed herein, particularly the NYPD's bizarre actions against Iscenko directed from within the EEO office, of which DC Zeigler is the chief decision maker.  Many of these actions make no sense, except when viewed through the lens of this history.

**B.      The Implausibility of Defendants' Allegations**

Upon Montijo's complaint, Defendants immediately believed the substance was semen. (AC ¶ 46).  The allegation itself is simply incredible.  Defendants leaped to the conclusion that a

11

nearly 30 year veteran of the force with no disciplinary history, but who instead had a history of good performance including a merit promotion, would one day and for no apparent reason, decide to throw semen on a co-worker he knew only casually.  (See AC ¶ 76 (Monitjo stated Iscenko was always courteous to her and she did not know why he would throw semen on her)).

Further, Defendants did not have at the time, nor at any time since, any idea or theory about how Iscenko could perpetrate such an act.  It does not require description here to explain why such an act requires a great deal of premeditation and preparation.  Yet, Defendants have no theory as to how Iscenko committed such an act and they certainly have no evidence establishing how he committed the act.  They did not have a theory or evidence when they made the allegation nor did they present a theory or evidence at the hearing, either.  (AC ¶ 85-86 (prosecutor conceded she had no idea how he did it)).  Rather, at the very initial stages, Defendants formed their theory of guilt, then ensured the evidence conformed to that the theory. (See e.g. AC 79 (explaining the use of two presumptive tests, instead of a confirmatory test for semen)).  As we know now, the substance is conclusively not semen.  That Defendants clung to such an implausible and absurd theory shows an improper motivation to condemn Iscenko for an infraction he did not commit.[4]

## C.    Deviations from Procedure

Evidence that an employer deviated from regular procedure is probative of discriminatory intent.  Dooley v. JetBlue Airways Corp., 636 Fed. Appx. 16, 21 (2d Cir. 2015) ("minimal" evidence of discrimination included employer failing to follow progressive discipline policy); Villar v. City of New York, 135 F. Supp. 3d 105, 125 (S.D.N.Y. 2015) (collecting cases and finding that evidence of pretext included that the NYPD deviated from "procedural regularity" in

---

4   Additionally, by having the GO15 hearing early in the proceedings, Defendants set him up for the "false statement" charge, further showing their motivation to doom Iscenko at any costs.

providing different disciplinary record to plaintiff, than was provided to commissioner in course of disciplinary hearing); Foss v. Coca-Cola Enters., 2011 U.S. Dist. LEXIS 34945, *25-26 (E.D.N.Y. 2011) (employer not following progressive discipline established "de minimus burden" to show inference of discrimination).

Here, the Complaint sets forth in factual detail, not legal conclusions, that Defendants deviated from procedure in at least seven material ways leading up to the termination: (1) the Crime Lab tested the substance for chemicals before the ME conducted biological testing (AC ¶¶ 47, 49); (2) the substance was stored for months before conducting any biological testing instead of being immediately tested (AC ¶¶ 47, 50); (3) the shoe was not collected at the same time as the stocking and napkin, which was then worn home (AC ¶¶ 43-45)[5]; (4) Iscenko was ordered to testify at a department GO15 hearing at the beginning of the investigation, instead of at the end (AC ¶ 52); (5) the NYPD released confidential information about Iscenko (AC ¶ 61); (6) DC Zeigler, head of the EEO, issued the charges against Iscenko, even though she had cleared Iscenko of sexual harassment so her office should have been divested of jurisdiction and interest in the matter; and (7) the ME's testing used two presumptive tests for semen instead of using a confirmatory test (AC ¶ 79).[6]

Defendants argue, without explanation, that the deviations here are distinguishable from the deviations which courts usually find to be probative of discrimination. (Def. Memo. at 9). As shown by Villar, a deviation in a hearing process which prejudices an NYPD employee can

---

5  If the arbitrator's decision is considered on this motion, the arbitrator noted that the handling of the paper towel and shoe did "not make for optimal evidence collection" further showing Plaintiff's prejudice from the NYPD's procedural deviations. (Nacchio Ex. A at p.12).

6  Notably, in their zeal to prosecute Iscenko, Defendants also deviated from Federal law by violating the Genetic Information Nondiscrimination Act by asking for Iscenko's DNA and then suspending him for refusing to provide it. 42 U.S.C. § 2000ff-1(b); (AC ¶ 55).

show discrimination.  Here, the deviations as to evidence collection and testing substantially prejudiced Iscenko, particularly when viewed in light of Iscenko's scientific evidence which clearly and indisputably proves the substance was not semen.  So, like the employee in <u>Villar</u>, who was provided with a different disciplinary record to review than was provided to the commissioner and which deprived her of the opportunity to raise the issue of falsity in one of the records, Iscenko was similarly disadvantaged by the NYPD grossly mishandling the scientific evidence which was crucial in the case.  The deviations show that the NYPD was either intentionally manipulating evidence to condemn Iscenko or just merely took a lackadaisical approach to the investigation because they were not interested in the truth, but were just interested in prosecuting Iscenko.  Either way, the deviations evidence improper motivations.

In addition to the investigative deviations, the NYPD deviated from procedures with respect to the criminal prosecution.  For instance, a grand jury was convened and a warrant was issued whereas for a class B misdemeanor such as that for which Iscenko was charged, NYPD officers would typically just issue a desk appearance ticket.  (AC ¶ 71).  Additionally, an EEO police officer was present at each of Iscenko's routine court appearances.  This is a deviation from procedure, as NYPD officers would not usually attend a routine appearance.  But, this is more significant because the officers were from EEO which is an NYPD office concerned with internal NYPD employment matters relating to equal employment, i.e. discrimination, so there is no reasonable business reason for an EEO officer to attend a routine criminal court conference for a terminated NYPD employee.  A reasonable and plausible inference is that for an EEO officer to have done so, he would have had to have been directed by a superior, i.e. DC Zeigler. As discussed below, her continued interest in the Iscenko matter shows her animus.

Further, the DA refuses to offer a plea deal to Iscenko which is also a deviation from

normal practice, as typically the DA would agree to plea deals, including ones with discontinuances, for suspects charged with even more serious crimes than Iscenko.  (AC ¶ 90).

In sum, the NYPD deviated substantially from procedures in more than a half dozen different ways.  The deviations are pled in factual detail, not legal conclusions.  Further, many of these deviations related to investigative procedures, which should be even more probative here than in other employment cases, because the NYPD is one of the largest, most well trained, and elite police forces in the country, if not the world.   To deviate so substantially without explanation or because of mere negligence does not make sense, particularly because of the number of deviations.  Rather, in the context of the history explained above, it is more plausible that DC Zeigler was pushing for a particular result in this case involving a white OCCB officer, to wit, Iscenko's guilt.

**D.      Actions Taken for No Logical Explanation**

Action taken for no logical reason is "strong evidence of an intent to discriminate." Stratton, 132 F.3d at 880 n.6; Robinson v. Gucci Amer., No. 11-CV-3742, 2012 U.S. Dist. LEXIS 10014, *14-15 (S.D.N.Y. Jan. 26, 2012).  In Robinson, the sole allegation to establish causation against one of the individuals was that he ordered the employee, an attorney, to work in New Jersey, even though she was not licensed to practice law in that state.  Robinson, 2012 U.S. Dist. LEXIS 10014, at *14-15.   The Court concluded that this allegation sufficiently pled the individual's intent since there was no logical reason for him to have done so.  Id.

Here, the NYPD continues to prosecute Iscenko despite his indisputable scientific evidence which negates an essential element of the crime.  Moreover, the prosecution continued while the DA "lost" the DNA evidence making it wholly impossible to prove the crime.  To continue a prosecution without necessary evidence makes no sense, except if Defendants are

acting with an improper purpose.  (AC ¶¶ 95-96).  Again, the allegation that an EEO officer is present at the criminal proceedings suggests that DC Zeigler is a driving force in the decision to maintain the prosecution.  There is no logical reason to continue prosecuting, except to cover up Defendants' unlawful motivations and their mishandling of the disciplinary charges.

Additionally, there is no logical reason for the convening of a grand jury or for having a warrant issued for Iscenko's arrest, when a desk appearance ticket could have been issued.  Both actions showed a heightened antagonism towards Iscenko and the use of the grand jury could plausibly be inferred to be used by Defendants as a device to hide improper motivations.  Indeed, Defendants conveniently argue now that the grand jury agreed with the NYPD's "belief that plaintiff threw his semen."  (Def. Memo. at 11).  Accordingly, Defendants' illogical actions support an inference of discrimination.

**E.      Open Hostilities**

Zeigler's office, the EEO, is charged with investigating, preventing, and correcting instances of unlawful discrimination.  (AC ¶ 98).  With respect to Iscenko, Zeigler determined that the allegations of discrimination against him were unfounded.  Yet, she continued to prosecute Iscenko for other acts of misconduct, instead of referring the matter to Iscenko's command or internal affairs.  Her interest in prosecuting Iscenko, despite his purported violations not relating to Zeigler's office's jurisdiction, suggests her improper motivations.

Zeigler's open hostility towards Iscenko is also shown by the fact that the criminal prosecution for a low level offense has lingered for 18 months against Iscenko, even though he has exonerating evidence and it continued while the DA "lost" the evidence it needed to prove its case.  Additionally, that Zeigler's office, which is concerned with internal employment matters, directs one of its officers to attend the criminal court appearances for someone who is no longer

employed by the department and who was cleared of EEO violations, further shows her interest in Iscenko and in furthering the prosecution.

**F.        Montijo's Complaint Provided Zeigler With an Opportunity to Discriminate**

The Second Circuit routinely emphasizes that there is no bright line rule which defines the outer limits, beyond which temporal proximity becomes too attenuated.  E.g. Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013) (start of the spring football season was the "first actual opportunity to retaliate").  The Circuit recognizes that defendants typically "lay in wait" for a suitable time to exact their revenge, oftentimes waiting for a time which provides a suitable explanation for the resulting injury.  Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) ("It is plausible that the officers waited to exact their retaliation at an opportune time . . . in order to have a ready explanation for any injuries suffered by [plaintiff].").

Here, Chief Zeigler and DC Zeigler had little, if any, opportunity to act against Iscenko or other OCCB officers.  Chief Zeigler was transferred out of OCCB before Iscenko arrived and so he was not Iscenko's supervisor.  So, he could not issue poor performance evaluations, transfer Iscenko, or take any other discriminatory employment action against Iscenko or other OCCB officers.  Similarly, DC Zeigler's responsibilities involve a discrete area of employment and she did not have day to day authority over Iscenko or the OCCB.  Thus, when Montijo walked into EEO stating only that she had a "creamy substance" on her leg and she thought OCCB officer Iscenko put it there, DC Zeigler finally had an opportunity to take action against Iscenko and her immediately trumping up the charge to claim the substance was semen – before any biological testing was done – shows her intent to hurt Iscenko with a claim which not only damaged him professionally, but damaged his reputation, as well.

Indeed, Montijo did not know what the substance was and did not believe anything that

happened was sex-based, instead, complaining about national origin discrimination. (AC ¶ 41). DC Zeigler converted the complaint to a vague reference of "complaint of employment discrimination." (AC ¶ 51). In doing so, her office was able to retain jurisdiction over the matter, instead of the case being sent back to Iscenko's command or to internal affairs. Accordingly, when the totality of the circumstances are viewed, the Amended Complaint plausibly establishes that Montijo's complaint gave DC Zeigler an opportunity to discriminate against a white OCCB officer, in revenge for her husband having been discriminated against based on his race in highly embarrassing and public ways.

## II.    COLLATERAL ESTOPPEL HAS NO IMPACT ON THIS ACTION

Defendants argue that Iscenko cannot assert his innocence of the departmental charges in this case and because he cannot do so, then "This is an end to this case." (Def. Memo at 11). As discussed below: (A) Defendants assert their collateral estoppel defense in only conclusory terms; (B) the hearing officer did not make a determination as to whether the issuing of the charges was motivated by racial animus; and (C) the fact that the substance was not semen is highly probative and relevant in this case and should be considered.

### A.    Defendants Have Not Shown the Elements of Collateral Estoppel

Although Defendants set forth the elements of collateral estoppel in their memo (elements Iscenko does not dispute), they did not argue or show how those elements are met here, instead relying on decisions in other cases applying collateral estoppel to administrative decisions. (Def. Memo at 11). Relevant here is the question of whether Iscenko had a "full and fair opportunity to litigate in the prior proceeding." Grieve v. Tamerin, 269 F.3d 149, 153 (2d Cir. 2001). Preclusion is not appropriate when there is "a compelling showing of unfairness or inadequacy in the prior litigation" and District Courts may exercise discretion and deny collateral estoppel

where unfairness is shown.  Bear, Stearns, & Co. v. 1109580 Ont. Inc., 409 F.3d 87, 91-92 (2d Cir. 2005);  Galin v. United States, No. 08-CV-2508, 2008 U.S. Dist. LEXIS 103884, *23-24 (S.D.N.Y. 2008) (citation omitted).

Unfairness or inadequacy can be shown by "whether without fault of his own the [party against whom collateral estoppel is to be invoked] was deprived of crucial evidence or witnesses in the first litigation." Id. (quoting Blonder-Tongue Lab. v. Univ. of Ill. Found., 402 U.S. 313, 333 (1971) (alterations in the original).  Other factors considered on the issue of fairness include:

> the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law[,] and foreseeability of future litigation

CBF Industria de Gusa S/A v. AMCI Holdings, Inc., 15-1133-cv, 2017 U.S. App. LEXIS 899, *48 (2d Cir. Jan. 18, 2017) (emphasis added) (quotation omitted); See also Levich v. Liberty Central Sch. Dist., 361 F. Supp. 2d 151, 158 (S.D.N.Y. 2004) (noting other factors used by the New York Court of Appeals to determine fairness: "the realities of the prior litigation, including the context and other circumstances which may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him.").

Here, the hearing officer's decision relied heavily on the scientific evidence identifying and matching the substance as Iscenko's semen.  (Nacchio Ex. A at pp. 11-16).  The Amended Complaint demonstrates that Iscenko was not given access to the substance until May 2016, nearly eight months after the department trial.  (AC ¶ 93).  Further, the scientific evidence was admitted into evidence without the protections provided by Frye or Daubert.  Thus, Iscenko was deprived of the opportunity to offer his own analysis and expert opinion on the identity of the substance which establishes unfairness.

Further, Iscenko's newly available scientific evidence, which wholly undermines the NYPD's conclusions, shows just how prejudiced Iscenko's defense was. This evidence is highly probative on so many issues, it is fundamentally unfair to bind Iscenko to facts which are now totally undermined.  Moreover, although Iscenko's job was at risk, the internal department trial is hardly the forum or proceeding which would motivate Iscenko, or anyone else, to undertake the costs and expenses associated with retaining a DNA or other scientific expert, particularly when he knew he did not throw semen and believed it an impossible allegation to prove.

In sum, this is not a case where it might be appropriate to defer to credibility determinations made during a prior litigation.  Rather, here, incredibly important and determinative factual conclusions were made based on scientific evidence which was tainted from the beginning, which has ultimately been shown to be wrong, and which Iscenko was deprived of the opportunity to test or to offer his own evidence to contradict.  Accordingly, Iscenko did not have a fair opportunity to litigate the issue and the Court should exercise its discretion to deny collateral estoppel.

## B.      Iscenko Does Not Need to Prove His Innocence

The truth of the disciplinary charges is not relevant to the issue of whether defendants were motivated to issue the charges, in part, by racial animus.  McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006).  Even where a plaintiff is "guilty" of misconduct, a claim that the charges were initiated for improper purposes may still be maintained.  See Skehan v. Village of Mamaroneck, 465 F.3d 96, 107 (2d Cir. 2006);  DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 116 n.8 (2d Cir. 1987).  Moreover, collateral estoppel cannot bar a plaintiff from arguing a defendant's unlawful racial motivations.  Buttaro v. City of New York, 15-CV-5703, 2016 U.S. Dist. LEXIS 125965, *15-19 (E.D.N.Y Sept. 15, 2016) (legal

determinations are not entitled to preclusive effect and discrimination claim could proceed even though ALJ determined plaintiff's "guilt" in underlying employment action).

Here, even if collateral estoppel is applied on the factual determinations made by the hearing officer, that is not dispositive on the issue of discrimination.[7]   Accordingly, Iscenko's purported "guilt" is not the "end of the case" because the Amended Complaint states a plausible claim for race discrimination as discussed above.

**C.    Iscenko's Scientific Evidence is Probative as to Defendants' Intent**

Even if collateral estoppel prevents Iscenko from arguing "innocence" as to the internal charges, it will not bind him in the criminal proceeding.  See People v. Plevy, 52 N.Y.2d 58, 64 - 65 (1980) (the concern in criminal cases is to "reach the correct result" so estoppel is "less relevant").  The Amended Complaint sets forth that Iscenko's evidence proves the substance is not semen and that despite this evidence, the DA continues to prosecute him for a crime which it cannot prove.  (AC ¶¶ 95-96).  So, if he cannot claim "innocence" for the disciplinary charges, there is no reason he should not be able to use the fact that the DA continues its baseless prosecution of Iscenko in the face of exonerating evidence, a fact which further supports Defendants' improper motivations.   See Kinzer v. Jackson, 316 F.3d 139, 144 (2d Cir. 2003) (noting New York law establishes that probable cause to prosecute may be eliminated if the groundless nature of the charges is made apparent).

**III.    ZEIGLER'S PERSONAL INVOLVEMENT IN DISCRIMINATION IS ALLEGED**

Defendants argue that DC Zeigler should be dismissed because (A) her personal involvement is not alleged, and (B) she is protected by qualified immunity.  Each argument is

---

7  Similarly, Defendants have not established that the hearing officer made a factual determination that Defendants did not deviate from procedure so Plaintiff should not be barred from making that argument in this case.  Indeed, the hearing officer noted that evidence collection was not optimal.

addressed below and each fails because Zeigler discriminated against Iscenko.

## A.    DC Zeigler Issued Charges and Directed Other Conduct at Iscenko

Individuals may be liable under the NYSHRL, NYCHRL, and Section 1983 when the individual's personal involvement is alleged.  See  Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004); Robinson, 2012 U.S. Dist. LEXIS 10014, *14-15 ("direct, purposeful participation" must be shown under the NYSHRL (quotation omitted)).  Issuing charges constitutes personal involvement.  Amorosano-Lepore v. Generoso, 06-CV-1223, 2008 U.S. Dist. LEXIS 55641, *37 (S.D.N.Y. July 18, 2008).  Here, Defendants admit that DC Zeigler issued the charges against Iscenko and it is not disputed that those charges resulted in Iscenko's termination.  Additionally, and as set forth above, DC Zeigler's participation in other action, such as the ongoing criminal prosecution against Iscenko, can be inferred from the Amended Complaint.  Accordingly, DC Zeigler's personal involvement is alleged.

Defendants' "personal involvement" argument is really that DC Zeigler's actions were legitimate and that Iscenko has not alleged her discriminatory intent.  As discussed above, the discriminatory intent is established, in large part, because of the historical background of DC Zeigler and her husband.  Thus, if the Court finds that the Amended Complaint states a claim of discrimination, there can be no doubt that DC Zeigler was involved in the discrimination.

## B.    Race Discrimination Law is Clearly Established

To determine whether to apply qualified immunity, the Court must first determine if a Constitutional violation exists.  Fierro v. City of N.Y., 341 Fed. Appx. 696, 698 (2d Cir. July 27, 2009) (citation omitted).  If so, "then the Court must determine if that right was clearly established at the time the challenged decision was made, and whether the Defendants' actions were objectively unreasonable." Id. (citation omitted).  A Supreme Court or Second Circuit

precedent makes a constitutional right "clearly established." <u>Francis v. Coughlin</u>, 891 F.2d 43, 46 (2d Cir. 1989); <u>Jermosen v. Smith</u>, 945 F.2d 547, 550 (2d Cir. 1991).  Qualified immunity is a "fact-specific inquiry . . . which is generally premature to address" on a motion to dismiss. <u>Jefferson v. Koenig</u>, 15-CV-0544, 2016 U.S. Dist. LEXIS 5464, *18-19 (E.D.N.Y. Jan. 15, 2016) (quotation omitted); <u>See</u> <u>also</u> <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 385 (2d Cir. 1999) (qualified immunity is disfavored on summary judgment when the "specific intent of a defendant is an element of plaintiff's claim").  The right to be free from "race discrimination in public employment" was clearly established in 2015.  <u>Ragin v. Newburgh Enlarged City Sch. Dist.</u>, 06 Civ. 2797, 2009 U.S. Dist. LEXIS 118704, *35 (S.D.N.Y. Dec. 17, 2009).

Here, the Amended Complaint states a race discrimination claim against DC Zeigler, as explained above.  As Iscenko's right to be free from race discrimination was clearly established at the time DC Zeigler discriminated against him, qualified immunity cannot shield DC Zeigler.

## IV.    ZEIGLER IS A POLICYMAKER WHO FAILED TO ADEQUATELY TRAIN AND   SUPERVISE HER SUBORDINATES

Under <u>Monell v. Dep't of Social Servs.</u>, a municipality may be liable for its employees' constitutional violations where its policy, custom, or practice caused the deprivation of rights. <u>Lehal v. Central Falls Detention Facility Corp.</u>, 13cv3923, 2016 U.S. Dist. LEXIS 177587, *20-21 (S.D.N.Y. Nov. 21, 2016).  Of the ways in which a plaintiff can show such a policy or practice, the ways applicable here are: (A) failure to train and supervise; and (B) actions taken by a policymaker.  <u>Board of County Commissioners of Bryan County v. Brown</u>, 520 U.S. 397, 417-18 (1997); <u>Lehal</u>, 2016 U.S. Dist. LEXIS 177587, at *19.  Each of these bases of <u>Monell</u> liability are discussed below.

### A.    The Procedural Deviations Show the NYPD Failed to Train and Supervise

A failure to train theory requires a plaintiff to show that the municipality's failure to train

its employees amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."   Connick v. Thompson, 563 U.S. 51, 61 (2011) (quotation omitted).  Although a pattern of similar cases is sometimes necessary to show a failure to train, the Supreme Court recognizes "single-incident liability" where the "unconstitutional consequences of failing to train [are] so patently obvious."  Id.  Additionally, a municipality may be liable even where a majority of the actors lacked a discriminatory animus, but where the animus of one individual tainted the process.  Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 786 (2d Cir. 2007).

Here, DC Zeigler allowed her animus to taint the process of the investigation and prosecution of Iscenko.  She either failed to supervise her subordinates conducting the investigation or failed to properly train them in the first instance, allowing improper investigative procedures to result in erroneous conclusions and unreliable evidence.  Either way, it was highly likely that the DC Zeigler and her office would come into contact with persons accused of EEO violations, like Iscenko.  Her failure to train and/or supervise because of her animus resulted in Iscenko's rights being violated.  Accordingly, the City is liable under Monell.

**B.     DC Zeigler is a Policy Maker**

Individuals who act with "final policy-making authority with respect to decisions that caused Plaintiff's alleged constitutional deprivations" are considered policymakers and their actions may impute liability to the municipality under Monell.  Johnson v. City of New York, 06 CV 09426, 2011 U.S. Dist. LEXIS 15867, *9 (S.D.N.Y. Feb. 15, 2011);  See also Nagle v. Marron, 663 F.3d 100, 117 (2d Cir. 2011) ("an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy" (quotation omitted)).

Here, the Amended Complaint sets forth that the EEO office is responsible for investigating, preventing, and correcting unlawful discrimination and that DC Zeigler is the highest ranking NYPD official in that office, and is ultimately responsible for the EEO's actions. (AC 7, 39, 99).  Accordingly, the Amended Complaint plausibly establishes that DC Zeigler is the policy maker responsible for EEO matters, including investigations.  As set forth above, DC Zeigler wholly failed in her responsibilities by maintaining an investigation and prosecution of Iscenko which was motivated by her racial animus and in failing to conduct a good faith and proper investigation which would have proven that Iscneko did not throw semen on Montijo. DC Zeigler's failure's as a policy maker impute liability to the City so Monell liability is plausibly established.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests an order denying Defendants' motion to dismiss.

Dated: Melville, New York
      February 10, 2017

                                  Respectfully submitted,

                                  Famighetti & Weinick, PLLC
                                  *Attorneys for Plaintiff*
                                  155 Pinelawn Road, Suite 220S
                                  Melville, New York 11747
                                  (631) 352-0050

                                  _____/s/_____
                                    Matthew Weinick

25
