```
UNITED STATES DISTRICT COURT                        USDC SDNY
SOUTHERN DISTRICT OF NEW YORK                       DOCUMENT
------------------------------------------------ X  ELECTRONICALLY FILED
                                                 :  DOC #:_____
MICHAEL ISCENKO,                                 :  DATE FILED: 07/05/17
                              Plaintiff,         :
                                                 :  16 Civ. 6535 (LGS)
              -against-                          :
                                                 :  OPINION AND ORDER
CITY OF NEW YORK, et al.,                        :
                              Defendants.        :
------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

Plaintiff Michael Iscenko, a former NYPD detective, was fired after being found guilty at a department trial of having thrown semen on a co-worker. He sues based on his termination and the events preceding it, alleging race discrimination in violation of the Equal Protection Clause and 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). Defendants -- the City of New York (the "City") and Neldra Zeigler, the Deputy Commissioner of the NYPD's Office of Equal Employment Opportunity ("EEO Office") -- move to dismiss the Amended Complaint (the "Complaint"). For the following reasons, the motion is granted.

I.  **BACKGROUND**

The following facts are taken from the Complaint and accepted as true for the purposes of this motion.[1] *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

---

[1] Defendants appended to their motion the department trial examiner's decision and Plaintiff's order of dismissal, which they argue may be considered on this motion because it is integral to the Complaint. *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). Because the Complaint on its face fails to state a claim, the Court does not consider the documents or address Defendants' contention that they may be considered.

In 1986, the NYPD hired Plaintiff, a white male, as a police officer and, in 1997, promoted him to the rank of sergeant. Plaintiff received another merit promotion in 2008 and was assigned the rank of detective sergeant. Throughout his employment, he performed his duties in an exemplary manner.

In 2006, the NYPD chose Chief Anthony Izzo, a white male, to replace Chief Doug Zeigler, a black male, as the head of the Organized Crime Control Bureau ("OCCB"). A reporter who covers NYPD operations wrote that Chief Izzo was Chief Zeigler's "nemesis." Chief Izzo replaced Chief Zeigler's team with his own "hand-picked team of sergeants and lieutenants" -- including Plaintiff -- all of whom are white. Members of the NYPD believed these actions heightened the animus between Chief Izzo and Chief Zeigler.

In 2008, two plainclothes officers, who were white, approached Chief Zeigler for "no legitimate reason" while he was off-duty and ordered him out of his car, not believing he was an NYPD chief. Chief Zeigler said he was a "victim of discrimination" based on this incident.

In January 2015, while in the hallway near his office, Plaintiff walked by a civilian NYPD employee, Marilyn Montijo, a Hispanic female who is approximately 60 years old. According to Montijo, she felt something "cold" on her leg as Plaintiff passed and looked down to see a "creamy substance." She asked Plaintiff, "Why did you do that?" Plaintiff continued walking because he did "not think[] he had done anything."

That same day, Montijo made a complaint to the NYPD EEO Office. As Deputy Commissioner, Defendant Zeigler is ultimately responsible for the EEO Office. Defendant Zeigler, a black female, is married to Chief Zeigler.

While at the EEO Office, Montijo met the NYPD's Evidence Collection Team ("ECT"), which vouchered as evidence Montijo's stocking and the napkin she used to wipe the substance

from her stocking. Later that day, ECT went to her house to collect her shoe. Because the shoe had not been immediately collected, "it had been contaminated by Montijo wearing and walking in it."

On the same day as Montijo's complaint, Defendant Zeigler issued to Plaintiff a notice of complaint for unlawful employment discrimination based on national origin. Three days later, she issued a notice that removed the reference to national origin discrimination and instead stated that a "complaint of employment discrimination" had been filed against him.

Based on the items collected from Montijo, NYPD investigators believed the substance on her was semen. On January 30, 2015, Plaintiff appeared at a "GO15," i.e., a Departmental Hearing. He testified that he did not throw anything at Montijo but may have accidentally sneezed or coughed as he passed her in the hallway. Typically, a GO15 is conducted at the end of an investigation rather than, as here, towards the start.

In May 2015, the EEO Office asked Plaintiff to provide a DNA sample. He refused. The NYPD then placed Plaintiff on "modified assignment" and revoked his weapon, badge and work cell phone. Plaintiff was transferred to a housing bureau with significantly diminished job responsibilities and no opportunities for overtime pay. In June 2015, the NYPD suspended Plaintiff without pay for falsely stating that he did not throw anything on Montijo. One month later, the New York County District Attorney ("DA") obtained a court order commanding the NYPD to collect a DNA sample from Plaintiff. Someone within the NYPD "leaked" to the press confidential information contained in the court order.

In July 2015, Defendant Zeigler endorsed charges against Plaintiff for the Montijo incident and alleged false statement. Defendant Zeigler "[s]ubstantiated" an unspecified allegation of "serious misconduct," although she also advised Plaintiff that the allegation of

"sexual harassment/hostile work environment" was "[u]nsubstantiated." After Plaintiff's suspension ended in mid-July 2015, he returned to work in the housing bureau.

Plaintiff's union lawyer told him that the DNA test matched him and he should consider retiring. On September 1, 2015, Plaintiff submitted paperwork to begin processing his retirement. On September 3, 2015, a grand jury indicted Plaintiff for a class B misdemeanor. He was arrested, which was an unusual procedure given the charge, and released on bail after pleading not guilty. Plaintiff was again suspended without pay for 30 days.

In mid-September 2015, Plaintiff appeared at his trial conducted by the Department Advocate's Office. Montijo testified that Plaintiff was "always courteous to her" and had not "made any advances on her;" she also said she could not understand why Plaintiff would throw semen on her. Plaintiff testified that he did not throw anything at Montijo.

A medical examiner testified that "she did not test the substance with the goal of determining what the substance was. Rather, she believed it was semen and tested it to confirm it was semen." The examiner concluded that she found semen on the shoe, which had been contaminated by Montijo walking in it, but could not confirm it was on Montijo's stocking or napkin. The medical examiner's tests were improper and unreliable as detailed in the Complaint, and proved only that Plaintiff's "skin cells wound up on Montijo."

The NYPD deviated from its "proper procedure" in handling the biological evidence. It should have been logged in the Crime Lab and then immediately sent to the Medical Examiner's Office for testing. However, in this case, the Crime Lab improperly tested the substance for chemicals before the Medical Examiner's Office conducted any tests, and the Property Clerk's Office stored it for five months before it was sent to the Medical Examiner's Office.

The arbitrator determined that Plaintiff was guilty and recommended his dismissal. The NYPD terminated Plaintiff's employment as of September 25, 2015. The criminal proceedings continued, and a representative from the EEO Office, which handles only internal police employment matters, appeared at his court appearances.

The DA refused to agree to a plea involving a discontinuance, "even though [Plaintiff] is charged only with a low level misdemeanor," and continued to prosecute him even though it temporarily lost the DNA evidence. In May 2016, after finding the evidence, the DA gave it to Plaintiff, who had it tested. The testing revealed that the substance on Montijo's shoe was saliva, not semen. As of the date of this Opinion, the DA continues to prosecute the criminal case.

## II. STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016).

## III. DISCUSSION

Plaintiff brings two federal claims. Count One is a § 1983 claim against both defendants -- Defendant Zeigler based on discriminatory adverse employment actions, and Defendant City based on deliberate indifference to constitutional violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Count Four is a Title VII claim against the City based on discriminatory adverse employment actions. Both counts are dismissed because the Complaint does not plausibly allege that Plaintiff's race was a motivating factor in the challenged employment actions. The *Monell* claim against the City is dismissed because the Complaint does not adequately allege an underlying constitutional violation. In light of the dismissal of the federal claims, the Court declines to exercise supplemental jurisdiction over Counts Two and Three, the state and city law claims.

### A. Race Discrimination Claims -- Title VII and § 1983

To survive a motion to dismiss in a Title VII discrimination case, "a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). This burden is "minimal." *Id.* at 86. A plaintiff is not required to plead facts establishing a prima facie case of discrimination under the *McDonnell Douglas* framework, which applies on summary judgment. *Id.* at 84; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). With respect to discriminatory intent, at this initial stage, "[t]he facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to

a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

"[F]or a § 1983 discrimination claim to survive . . . a motion to dismiss, a plaintiff must plausibly allege a claim under the same standards applicable to a Title VII claim -- and that the adverse action was taken by someone acting 'under color of state law.'" *Vega*, 801 F.3d at 88. Thus, "[o]nce the color of law requirement is met, a plaintiff's 'equal protection claim parallels his Title VII claim,' except that a § 1983 claim, unlike a Title VII claim, can be brought against an individual." *Id.* (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004)).

Both the Title VII claim and the § 1983 equal protection claim are dismissed. The Complaint alleges that Defendants took adverse employment actions -- suspended Plaintiff without pay, significantly diminished his responsibilities, filed charges against him and fired him -- at least in part because he is white.[2] But the Complaint does not allege facts that plausibly support this conclusion. "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted). "[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id.* None of these circumstances is alleged here. The Complaint does not allege that Defendants made racially charged remarks, or treated non-white employees more favorably, or replaced Plaintiff with a

---

[2] Defendants do not dispute that Plaintiff was subjected to adverse employment action under Title VII or § 1983, or that Defendant Zeigler was acting under color of state law. Consequently, those issues are not addressed here.

7

non-white employee. Nor does the Complaint allege facts -- as opposed to conclusory statements and surmise -- that Plaintiff's investigation and termination were motivated by his being white.

As evidence of discriminatory intent the Complaint expressly pleads: (1) the NYPD's deviations from its procedure in investigating Plaintiff, (2) the background of perceived discrimination against Defendant Zeigler's husband in 2006, and his replacement as head of the OCCB unit, which involved the hiring of an all-white team, including Plaintiff and (3) "the NYPD continuing to prosecute [Plaintiff] long after it became clear that [he] was not guilty of the [alleged] misconduct." Even accepting as true the Complaint's allegations that the charges against Plaintiff were unfounded and that he was mistreated and wrongfully terminated, the Complaint does not plead facts sufficient to suggest that any of this was because he is white.

The only allegations that bear on race regard Chief Zeigler -- not his wife Defendant Zeigler or Plaintiff. Plaintiff argues that the Complaint adequately alleges that Defendant Zeigler developed "a simmering animus" towards white officers, especially those Chief Izzo selected, after her husband was replaced in 2006. Plaintiff further argues that Montijo's complaint gave Defendant Zeigler the opportunity to "exact" revenge. These arguments are fanciful and unsupported by the alleged facts. First, although the Complaint alleges an "animus" between Chief Zeigler and Chief Izzo, it does not allege any facts that plausibly support the inference that the animus was race-based. Second, the 2008 incident that occurred while Chief Zeigler was off-duty did not involve Chief Izzo or Plaintiff who at one time was on Izzo's staff, and the incident does not plausibly suggest that Chief Zeigler, much less his wife, developed racial animus towards Chief Izzo or Plaintiff as a result. Finally, that Defendant Zeigler and her husband are black and Plaintiff is white does not mean or plausibly suggest that any actions Defendant

8

Zeigler took regarding Plaintiff were on account of his race. *See Stephens-Buie v. Shinseki*, No. 09 Civ. 2397, 2011 WL 2574396, at *5 (S.D.N.Y. June 27, 2011) (noting that the "mere fact" that plaintiff's race was different than those who caused the alleged adverse employment action was insufficient to raise an inference of discriminatory intent); *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (dismissing discrimination claim under 42 U.S.C. § 1981 where the plaintiff "offered no reason to suspect that his being found guilty of sexual harassment had anything to do with his race, other than his assertion that the panel members were white and that he is Bengali").

The timing of the alleged events also undercuts any plausible inference of discrimination. While the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . , courts in this circuit have typically measured that gap as a matter of months, not years." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012); *see, e.g.*, *Meyer v. McDonald*, No. 15 Civ. 1496, 2017 WL 1048104, at *11 (E.D.N.Y. Mar. 20, 2017) ("Each temporal analysis must be made within the context of a case, but the . . . Second Circuit has determined that seven months is not too long to establish a causal relationship, while fifteen months or two years is too long."). Here, roughly nine years elapsed between Chief Izzo's replacing Chief Zeigler and the Montijo incident. The temporal distance is too attenuated to support a reasonable inference that Chief Izzo caused Chief Zeigler, and in turn Defendant Zeigler, to develop animus towards white officers and then seek "revenge" against Plaintiff almost a decade later. Although Plaintiff argues in his memorandum of law that Defendant Zeigler, the head of the EEO Office, lacked the opportunity for almost nine years to "take action" against Plaintiff or other OCCB officers until

9

the 2015 Montijo incident, the Complaint contains no factual allegations to support this improbable contention.

The Complaint also alleges as evidence of discriminatory intent that Defendants failed to follow regular procedures when investigating and charging Plaintiff. "Departures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the decision." *Tolbert v. Smith*, 790 F.3d 427, 438 (2d Cir. 2015) (internal quotation marks omitted). However, "the mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent." *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 599 (2d Cir. 2001) (internal quotation marks and alteration omitted); *accord Thelwell v. City of New York*, No. 13 Civ. 1260, 2015 WL 4545881, at *15 (S.D.N.Y. July 28, 2015). Failure to follow internal procedures may as likely be the product of neglect or personal hostility, as some unlawful discriminatory motive. The anti-discrimination laws do "not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating*." *Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998).

Even assuming that the NYPD deviated from established procedures when it investigated and charged Plaintiff, the Complaint fails to allege any facts that plausibly give rise to the minimal inference that the NYPD did so at least in part because of Plaintiff's race. *See, e.g.*, *Tolbert*, 790 F.3d at 438 (plaintiff raised a genuine factual dispute as to intentional discrimination by alleging procedural irregularities combined with remarks by decision maker that "clearly suggest racial bias"); *Stern v. Tr. of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) (noting that the plaintiff had produced sufficient evidence that employer "desired to hire a woman or [Latino]" based in part on procedural deviations that favored women or Latino

candidates, such as the employer offering a job "summarily to a woman without following any of its usual procedures" or hiring the Latino candidate with "unusual rapidity").

To show discriminatory intent, Plaintiff also relies on the myriad ways the Complaint alleges Plaintiff was treated unfairly by the NYPD investigators, the DA, the Medical Examiner's Office, the EEO Office and the Departmental Advocate Office. These allegations, even when coupled with the alleged procedural deviations, do not "nudge[]" the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570; *accord E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014). To state a claim, Plaintiff must do more than simply "cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race." *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002); *accord Howard v. City of New York*, 602 F. App'x 545, 548 (2d Cir. 2015) (summary order).

In sum, the Complaint does not "plausibly give rise to an inference of unlawful discrimination." *Vega*, 801 F.3d at 87. The Title VII and § 1983 equal protection claims are dismissed. Because the Complaint fails to state a claim, Defendants' argument for dismissal based on collateral estoppel is not addressed.

**B.** *Monell* **Claim**

The Complaint alleges that the City is liable because its deliberate indifference led to the violation of Plaintiff's constitutional rights. In order to hold a municipality liable for a constitutional violation under § 1983, a plaintiff must demonstrate that "the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell*, 436 U.S. at 690–91); *accord Mitchell v. City of New York*, 841 F.3d 72, 80 (2d Cir. 2016).

As explained, the Complaint does not allege that Plaintiff's rights under the Equal Protection Clause, or any constitutional provision, were violated. Because the Complaint does not adequately allege an underlying constitutional violation, his *Monell* claim fails. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (holding that if court "properly found no underlying constitutional violation," it was not necessary to consider claims of municipal liability under *Monell*); *Cohen v. Walcott*, No. 13 Civ. 9181, 2017 WL 2729091, at *5 (S.D.N.Y. June 23, 2017) ("Where, as here, a plaintiff fails to establish an underlying constitutional violation there can be no liability under *Monell*.").

### C. NYSHRL and NYCHRL Claims

Plaintiff's remaining discrimination claims arise under state and city law. A district court may decline to exercise supplemental jurisdiction over the claims arising under state and city law if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In considering whether to exercise its discretion, courts must weigh considerations of "[judicial] economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004). These factors will usually lead to dismissal of the non-federal claims when the federal claims have been dismissed at a relatively early stage. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Here, both federal claims against Defendants are dismissed on a Rule 12(b)(6) motion before significant discovery has taken place. It is therefore appropriate to decline to exercise supplemental jurisdiction. *See, e.g.*, *Cromwell-Gibbs v. Staybridge Suite Times Square*, No. 16 Civ. 5169, 2017 WL 2684063, at *8 (S.D.N.Y. June 20, 2017) (declining to exercise supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims after dismissing federal claims under Rule 12(b)(6)). Plaintiff's state and city law claims are dismissed without prejudice to refiling in state court.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to close the motion at Docket Number 19 and close the case.

Dated: July 5, 2017
      New York, New York

                                            **LORNA G. SCHOFIELD**
                                         **UNITED STATES DISTRICT JUDGE**